**George Everette SIBLEY, Jr., Petitioner,**

v.

**Grant CULLIVER, Warden, Holman State Prison, Atmore, Alabama, Respondent.**

**No. CIV.A. 02–A–1217–N.**

United States District Court, M.D. Alabama, Northern Division.

Feb. 3, 2003.

Bryan A. Stevenson, Cathleen I. Price, Equal Justice Initiative of Alabama, Mont-gomery, for George Everette Sibley, Jr., plaintiff.

Beth Jackson Hughes, David R. Clark, Regina Faye Speagle, Office of the Attorney General, James Roy Houts, Kristi L. Deason, Attorney General's Office, Montgomery, for Grantt Culliver, Warden, Michael Haley, Commissioner, Alabama Department of Corrections, defendants.

## MEMORANDUM OPINION AND ORDER

ALBRITTON, Chief Judge.

On October 4, 1993, Petitioner George Everette Sibley, Jr. was convicted in the Circuit Court of Lee County, Alabama, of capital murder. He was sentenced to death by the court following a unanimous recommendation of the jury. On September 30, 2002, the Supreme Court of Alabama set an execution date of November 7, 2002. On November 1, 2002, Sibley filed a Petition for Writ of Habeas Corpus in this court, together with a Motion for a Stay of Execution. On November 4, the State filed a Motion to Dismiss Federal Proceedings for Failure to Comply with the Statute of Limitations, and a hearing was held on November 5. Following the hearing on November 5, 2002, this court granted the Petitioner's Motion for a Stay of Execution due to the complex issues involved in determining whether this first habeas petition was timely filed within the one-year limitation period established by the Anti–Terrorism and Effective Death Penalty Act (AEDPA), and the serious time constraints imposed by the November 7, 2002 execution date. Evidence and briefs have been submitted by the parties, and this matter is now pending before the court on the State's Motion to Dismiss Federal Proceedings for Failure to Comply with the Statute of Limitations.

## I. FACTUAL BACKGROUND

The killing for which Sibley was convicted happened in the parking lot of a shopping center in Opelika, Alabama.

The Alabama Court of Criminal Appeals summarized the facts of this case as follows:

> In responding to a call placed by a concerned citizen who had overheard a child calling for help, an Opelika policeman, [Sgt.] Roger Lamar Motley, was killed in the line of duty. After making an initial inquiry of Sibley, Officer Motley was gunned down by Sibley and his codefendant, Lynda Lyon Block,[1] both of whom were fleeing from Florida to avoid being sentenced on assault charges.
>
>     \*    \*    \*    \*    \*    \*
>
> The prosecution's case was virtually impenetrable. The State produced 12 eyewitnesses, made a thorough presentation of forensic evidence tying Sibley to the murder of Officer Motley, and presented Sibley's statement and testimony. Sibley admitted that he shot Officer Motley, but argued that his actions were in self defense.

*Sibley v. State,* 775 So.2d 235, 240 (Ala. Crim.App.1996).

## II. PROCEDURAL BACKGROUND

George E. Sibley, Jr. was indicted for the murder of Roger Lamar Motley, an Opelika police officer. Specifically, [he] was indicted under § 13A-5-40(a)(5), Code of Alabama 1975, which defines as a capital offense the murder of any police officer ... while such officer is on duty, regardless of whether the Defendant knew or should have known the victim was an officer ... on duty. The jury found [Sibley] guilty of capital murder and unanimously recommended the death penalty. The trial judge sentenced [Sibley] to death.

*Sibley,* 775 So.2d at 237.

### A. Trial

The evidence at trial showed that Sgt. Motley was killed in a shoot-out in the parking lot of a shopping center and that Sibley and his wife were apprehended when their car was stopped at a roadblock following a high speed chase.

Sibley was represented by appointed counsel which the state appellate court found "zealously represented him" by "fil[ing] numerous motions on Sibley's behalf, argu[ing] those motions at many hearings, and constantly consult[ing] with Sibley so that he had ample opportunity to participate in his own defense." *Sibley,* 775 So.2d at 240. Moreover, Sibley testified during the guilt and penalty phases of his trial.

After the jury's verdict of guilty, the court proceeded with the sentencing phase of the trial, in which the state and Sibley were to present evidence of aggravating and mitigating factors, respectively, to inform the jury's recommendation of an appropriate sentence to be imposed. The trial court found two aggravating circumstances—first, that Sibley knowingly created a great risk of death to many persons, and second, that the capital offense was committed for the purpose of avoiding or preventing lawful arrest. The trial court found no mitigating circumstances. The judge imposed the death penalty in accordance with a unanimous jury recommendation.

---

1. Lynda Lyon Block, Sibley's common law wife, who also is referred to in various documents as Lynda Lyon Sibley, and Lynda Lyon, was executed after midnight on the morning of Friday, May 10, 2002, for her role in the murder of Sgt. Motley. She declined to seek habeas relief in federal court.

## B. Appeal

Sibley was designated *pro se* on appeal, after refusing to have an appointed lawyer, but did not file a brief with the Alabama Court of Criminal Appeals. The Court of Criminal Appeals remanded the case to the trial judge in order for a hearing to be held to determine whether Sibley fully understood the ramifications and consequences of his failure to file an appellate brief and his waiver of appellate counsel. The trial court found Sibley competent to make the decisions to proceed *pro se* and to not file an appellate brief. Noting that appeals in death penalty cases are automatic, the Court of Criminal Appeals appointed a lawyer to represent him. Sibley, however, wrote a letter to that lawyer stating that he would not accept him as counsel.

Even though no brief was filed by Sibley, the Court of Criminal Appeals independently examined the record to determine whether he validly waived counsel, whether there was sufficient evidence at trial to support his conviction, and whether he was properly given the death penalty. The Court of Criminal Appeals affirmed in all respects. *Sibley,* 775 So.2d at 235.

Sibley did not petition for a writ of certiorari, but the Supreme Court of Alabama issued the writ *ex mero motu.* Sibley persisted in his refusal to accept appointed counsel's representation, and over his objections, the Supreme Court appointed an attorney to represent him. After reviewing that attorney's brief on behalf of Sibley, the Supreme Court of Alabama affirmed the actions of the trial court and the Court of Criminal Appeals. *Ex parte Sibley,* 775 So.2d 246 (Ala.2000).

Sibley did not file a petition for writ of certiorari in the Supreme Court of the United States, nor did he seek post-conviction review in the state trial court.

## C. Post Appeal Actions

On July 12, 2001, Sibley and his wife filed a Notice with the Supreme Court of Alabama, which Sibley now contends constitutes a second appeal, which is still pending before the state court, and which, as such, tolled and continues to toll the one-year AEDPA statute of limitations. The Notice reads as follows:

Notice to Chief Justice Roy Moore et. al.
Who Comprise the Supreme Court of
Alabama July 12, 2001

We, George Everette Sibley and Lynda Lyon–Sibley, whose birth name is Lynda Cheryle Lyon, give notice that we lodged an appeal against convictions of "capital murder" and sentence of death contrived by officers of the court in Lee County, Alabama; the dates of the "sentences" being June 10, 1994 and December 21, 1994, respectively. Our appeal documents were mailed to certain members of the Congress of the United States of America on April 20, 2000 and supplemented and/or amended thereafter. We know that only special cases fitting stringent criteria are considered by Congress, and our documents— and the charges and arguments within—fit those criteria.

We give further notice, as follows:

(1) We deny that we are the inferior class of citizen persons contrived by the 14th Amendment. The voluntary nature of that inferior citizenship is proven by the passage of 15 Stat.223 (codified in 1954 as 8 USC § 148) the day before the ratification proclamation. Nevertheless, despite our notice, the courts of the ASBA-run Unified Judicial System have constantly falsely portrayed us as such 14th Amendment citizens—persons—serfs.

(2) We have formally revoked our signatures from, and made void all agreements and contractual nexus with any and all governmental, quasi-governmental agen-

cies and entities anywhere, due to the elements fraud, coercion, misrepresentation, mistake, bankruptcy. This revocation and nullification is recognized by Ala.Code § 7–1–103, 7–2–608. As a result:

(a) We deny having Social Security numbers.

(b) We deny that we need, or hold any license. Not being licensed, we deny that we are engaged, knowingly or willingly, in trade or business with any enemy of the Constitutional United States, or ally of any enemy.

(c) We deny having any trade or business with the ASBA—run Unified Judicial System in Alabama, having withdrawn our appeal in mid–1995 and having stated so on record on March 19 and 20, 1996. We disavow all acts of attorneys.

(3) We deny that we have ever accepted the ABA's ridiculous invention called "self-representation" (or "pro se"); deny that we have ever "requested" such a condition, deny that we have appeared on court paperwork since approximately Oct. 5, 1993, and which the courts of the UJS have attempted to associate with us by several devices since that time; and deny that we have "waived" any of our God-given, unalienable rights, always reserving them when not actually exercised. We do not apply for, nor are we eligible for "civil rights", privileges or benefits under the 14th Amendment.

(4) We deny that we have ever petitioned the Supreme Court of Alabama and assert that we refused the attorneys who pretended representation of us by Order of Perry Hooper, Sr. Sham proceedings in the names of legal fictions followed—the fraud published at 744 So.2d 404 and 775 So.2d 235. In this fraud the attorneys did aid and abet in the attempt to apply these legal fictions to us, who are real people and non-participants.

(5) *This Notice may not be construed as a motion or pleading,* but only as a notice to the fact that we are actively appealing the convictions and sentences contrived against us in a venue Constitutionally available, and our reasons for not doing so in the Unified Judicial System. (Emphasis in original.)

### Verification

In the knowledge of the law against bearing false witness before God and men, we solemnly state that the preceding statements are true, to the best of our knowledge, information and belief.

In witness thereto, we sign our names, on the dates noted, in the year of our Lord, 2001.

*/s/ George Everett Sibley, jnr.*

July 12, 2001

George Everett Sibley, jnr.

Where located: Holman Prison

Atmore, Alabama

*/s/ Lynda Lyon–Sibley*

July 2, 2001

Lynda Lyon–Sibley

Where located: Tutwiler Prison

Wetumpka, Alabama

Appendix B, Appendix in Support of Petition for Writ of Habeas Corpus.

The "appeal documents" which the Notice states were mailed to certain members of Congress on April 20, 2000 apparently are the large volume of documents designated in Sibley's Appendix in Support of Petition for Writ of Habeas Corpus as Appendix D. This is comprised of many separate documents, some written by Sibley and some by his wife. The first page of the Appendix reads:

*TO THE LAWFUL MEMBERS OF THE CONGRESS OF THE UNITED STATES OF AMERICA, 105th CONGRESS*

WE BRING THESE TWO DOCUMENTS, WITH MEMORANDUM AND EXHIBITS, IN SUPPORT OF THE CAUSE OF OUR LIBERTY:

1. FORMAL CHARGE OF TREASON AGAINST THE OFFICERS AND MEMBERS OF THE AMERICAN BAR ASSOCIATION (ABA)

BROUGHT BY George Everett Sibley, junr., and wife, Lynda Cheryle Sibley.

2. *PETITION FOR ORDERS COMMANDING RELEASE FROM UNLAWFUL RESTRAINT OF LIBERTY,*

BROUGHT BY George Everette Sibley, junr., and wife Lynda Cheryle Sibley.

AGAINST

*Charlie Jones,* WARDEN, HOLMAN PRISON,

*Lynn Harrelson,* WARDEN, JULIA TUTWILER PRISON FOR WOMEN, AND

*Kevin Beary,* SHERIFF, ORANGE COUNTY, FLORIDA.

These documents allege in great detail a complex conspiracy by an illegal monopoly, the American Bar Association, which resulted in a take-over of the judicial systems of this country, both federal and state, by the ABA and its related entities, including the Alabama State Bar Association and Alabama's Unified Court System. It is then alleged that the ABA-controlled system is illegal and in violation of what is referred to as the "missing Thirteenth Amendment," to the United States Constitution, which stated that any person who accepts a title of nobility forfeits his United States citizenship, and which Amendment was ratified but subsequently hidden or excised from the law. Since lawyers and judges accept the titles "Esquire" and "The Honorable," it is argued, they are not citizens and the entire judicial system is illegal. Furthermore, these documents contend that the charge of conviction in this case, capital murder of a police officer acting in the line of duty, is unconstitutional because it bestows upon police officers special rights or a special designation of the worth of life in contravention of the "missing Thirteenth Amendment."

The documents then explain that these are reasons that Sibley and his wife refused appointed counsel on appeal and refused to pursue matters any further in the court system, and that only Congress can give them relief.

The fifth page of Appendix D addresses the documents "To the Members of the Senate (2) and (4) House of Representatives Who Are Not Members of a Bar Association." Eight members of Congress to whom the documents were sent are identified in a later "Revised Notice to Chief Justice Roy Moore et al," dated August 3, 2002. Appendix C to Appendix in Support of Petition for Writ of Habeas Corpus.

**III. DISCUSSION OF MERITS**

The central problem with the filing of Sibley's Petition for Writ of Habeas Corpus at this late date is the applicability of the time limits of the Anti–Terrorism and Effective Death Penalty Act (AEDPA). The Antiterrorism and Effective Death Penalty Act of 1996 establishes a one-year time limit for the filing of a petition for federal post-conviction relief by a person in state custody. 28 U.S.C. § 2244(d)(1). According to the statute, this one-year period runs from the latest of:

(A) the date on which the judgment became final by the conclusion of di-

rect review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by State action;

(C) the date on which the constitutional right asserted was legally recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* This one-year period may be tolled during the time that "a properly filed application for State postconviction or other collateral review ... is pending." 28 U.S.C. § 2244(d)(2).

In Sibley's case, the one-year period would run from the date of final judgment, as measured from the time at which all direct review was exhausted. Because no petition for the writ of certiorari was filed with the Supreme Court of the United States following the Supreme Court of Alabama's affirmance of the conviction and sentence, the time limit should run from the expiration of the time for filing the cert petition. *See Washington v. United States*, 243 F.3d 1299, 1300 (11th Cir.2001); *Johnson v. United States*, 246 F.3d 655, 657–58 (6th Cir.2001).

A petition for certiorari must be filed in the Supreme Court within 90 days, Sup.Ct. R. 13(1), of "the date of entry of the judgment or order sought to be reviewed, and not from the issuance of the mandate."

Sup.Ct. R. 13(3). The certificate of judgment in Sibley's case was issued by the Alabama Supreme Court on May 12,2000. Accordingly, the one-year limitation period for seeking habeas corpus review began running on August 11, 2000. Thus, absent a "properly filed application for State post-conviction or other collateral review," or some other legal basis for calculating the AEDPA time period, the one-year period ran on August 13, 2001 [2].

Sibley, however, makes several arguments as to why his November 1, 2002 Petition for Writ of Habeas Corpus was timely filed. First, he argues that the July 12, 2001, Notice which he filed with the Alabama Supreme Court was a "new appeal" which qualified as a petition for state post-conviction review, and thus tolled the one-year statute of limitations. Second, he argues that the one-year period should be equitably tolled because he is actually innocent of the crime and the sentence. Specifically he argues that he acted in self defense when he shot Sgt. Motley so he was unable to form the requisite intent, and he also argues that Sgt. Motley was actually killed by a bullet from Block's gun and not his own. In support of this claim he argues that there is new evidence not adduced at trial which would prove his claim of self defense and his claim that the shots he fired did not cause Sgt. Motley's death and would, therefore, create a reasonable probability that the outcome of his trial would have been different. Third, he argues that the claim that his conviction and death sentence violate *Ring v. Arizona* saves his entire habeas petition from a time bar because he has filed the Petition within one year from June 24, 2002, the date the Supreme Court issued *Ring*.

The court will now address each of the petitioner's arguments in turn.

---

**2.** August 12, 2001 fell on a Sunday.

### A. Properly Filed and Pending Post Conviction Application

■ Sibley alleges that his July 12, 2001 "Notice to Chief Justice Roy Moore et al. Who Comprise the Supreme Court of Alabama" and an August 3, 2002 "Revised Notice to Chief Justice Roy Moore et al Who Comprise the Supreme Court of Alabama, Regarding a Motion of Atty. Gen. Pryor Dated 7 June 2002" (Appendix C of Appendix in Support of Petition for Writ of Habeas Corpus) were collateral challenges to his conviction and death sentence which tolled the AEDPA's one-year statute of limitations.

First, in order to toll the statute of limitations a collateral challenge must be "properly filed". 28 U.S.C. § 2244(d)(2). Under *Artuz v. Bennett,* 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000)

> an application is 'properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee.

*Id.* at 8, 121 S.Ct. 361 (citations omitted).

Rule 32, *Alabama Rules of Criminal Procedure,* governs and directs the proper filing of post-conviction petitions for relief. Specifically, it states that a post-conviction petition "shall be filed in and decided by the court in which the petitioner was convicted." [3] Rule 32.5 *Ala. R.Crim. P.* Sibley was convicted of capital murder and sentenced to death by the Lee County Circuit Court, not the Alabama Supreme Court. Moreover, Rule 32.6(a) requires that the petition should be filed using the form accompanying Rule 32. Sibley did not file his "Notices" in the proper court, nor did

he use the proper form. Thus, the court could conclude solely on the basis of Rule 32 that Sibley's "Notices" were not properly filed under the state rules, and therefore, they cannot serve to toll the one-year statute of limitations.

Of even more concern, however, is whether these documents were "applications for State postconviction or other collateral review," whether properly filed or not. Sibley argues that, although his "Notices" were a "non-traditional" application for post-conviction review, the substance of them sought relief from the Court, and therefore, were sufficient to toll the AEDPA statute of limitations. Moreover, he argues that the Alabama Supreme Court treated the "Notices" as filed and that the Court's previous treatment of unorthodox post-conviction appeals supports his argument that the "Notices" were properly filed.

To support his argument that his filings were an application seeking relief Sibley points to a section in his August 3, 2002 Revised Notice which was sent to the Alabama Supreme Court. In it, at page 10, he wrote that the Court has

> neither legitimate jurisdiction, nor moral standing, to issue any instrument, contrivance or device whatever, intended to convince any agent under your influence to cause my death. Rather, you have only standing to order your subordinates to effect my release and compensation, and to restore to me my property.

Arguably, this could be read as a challenge to the Court's jurisdiction. Also, the court recognizes that the August 3, 2002 Notice does raise a number of the substantive issues which have been included in the habeas petition, i.e. actual innocence, and could possibly be interpreted as seeking

---

**3.** Rule 32.5 also contains a provision requiring that when "a petition is filed in another court, it shall be transferred to the court where the conviction occurred." No such action was taken by the Alabama Supreme Court in this case.

relief from his conviction and sentence. However, on the next page, Sibley writes "[t]his notice may not be construed as a motion or pleading." Moreover, the title of the August 3, 2002 Revised Notice indicates that it was filed as a response to the Attorney General's June 7, 2002 Motion to set an execution date. Indeed, the Revised Notice was docketed by the Alabama Supreme Court Clerk's office as a "Response to A.G.'s motion of June 7, 2002." Thus, under the circumstances the court could conclude that the relief sought by the August 3, 2002 Revised Notice was to prevent the court from setting an execution date, and was not a challenge to Sibley's conviction and sentence in the form of a post-conviction application.

There is, however, a more central problem with Sibley's reliance upon the August 3, 2002 Revised Notice as a basis for tolling the AEDPA one-year statute of limitations. That document was filed almost a year after the expiration of the AEDPA one-year period to file a habeas corpus petition, and therefore, could not toll the one-year period. Thus, even were the court to conclude that the August 3, 2002 Revised Notice sought relief sufficient to classify it as the type of application for review which could toll the statute of limitations, Sibley would still have to overcome the lateness of its filing. Sibley makes no such argument to the court.

It is clear to the court that Sibley points to the August 3, 2002 Revised Notice as support for his argument that he did seek review, because in no way can the July 12, 2001 Notice be read to seek relief from or review by the state courts. Rather, the July 12, 2001 Notice denounces the state court system's authority over Sibley and explains that he and Block have appealed

to the United States Congress. Specifically, the July 12, 2001 Notice states at pages 2–3 as follows:

(4) We deny that we have ever petitioned the Supreme Court of Alabama and assert that we refused the attorneys who pretended representation of us by Order of Perry Hooper, Sr.

(5) *This Notice may not be construed as a motion or pleading,* but only as a notice to the fact that we are actively appealing the convictions and sentences contrived against us in a venue constitutionally available, and our reasons for not doing so in the Unified Judicial System.

(Emphasis in original). Moreover, Sibley raises no substantive issues in the July 12, 2001 Notice. Clearly, rather than in any way being "a properly filed application for State postconviction or other collateral review, this was specific notice that Sibley was *not* seeking such review."

Because the court concludes that there is no way to construe the July 12, 2001 Notice as being an "application for State postconviction or other collateral review," and the August 3, 2002 Revised Notice was filed after expiration of the one-year period to file a habeas corpus petition, which ran on August 13, 2001, the court recognizes Sibley's argument to be that any relief sought in the August 3, 2002 Revised Notice should be deemed to have been asserted in the July 12, 2001 Notice. Sibley, himself, however makes no attempt in his Notices to relate the one of August 3, 2002 to that of July 12, 2001. Rather, in his August 3, 2002 Revised Notice Sibley writes that this notice "cancels, supercedes and replaces the notice completed on the 22nd of June, 2002, and its supplement completed on the 26th of June, 2002." [4]

4. The Alabama Supreme Court Docket Sheet provided to this court as an exhibit does not show that either a June 22, 2002 Notice or a June 26, 2002 Notice was ever filed with the Supreme Court. Moreover, these documents have not been submitted to this court as exhibits.

Because Sibley specifically references June 22nd and 26th 2002 notices and does not mention the July 12, 2001 Notice, the implication is that Sibley, himself, did not recognize the July 12, 2001 Notice as seeking any relief from or review by the courts. Thus, the court concludes that Sibley has provided no basis to conclude that the August 3, 2002 Revised Notice related in any way to the July 12, 2001 Notice. Moreover, the court concludes that Sibley fails to provide a basis to conclude that his Notices sought review of his conviction and sentence by the courts, since he emphatically notified the Alabama Supreme Court that he rejected any authority of the courts over him and was seeking relief solely from the Congress.

Next, Sibley argues that the July 12, 2001 Notice was treated in such a way by the Court that it could be found to be a properly filed application for review. The record reveals that the Alabama Supreme Court received Sibley's Notice on July 12, 2001 and the docket clerk entered the Notice on the docket sheet as "Letter from GS re: new appeal." There is no question that the Notice was filed; however the notation clearly indicates that the Clerk did not interpret it to be a request for relief of any kind.

It is not entirely clear from the record before this court what procedure the state court followed upon receipt of the July 12, 2001 Notice. Indeed, Alabama Supreme Court staff attorney John Dobbs testified before this court that Sibley's filing had been noted as part of his concluded direct appeal, and that the Court had taken no subsequent action in his case other than to set his execution date. Dobbs also testified that an execution date would not have been set if there were any outstanding requests for relief. However, Dobbs also testified that he was unsure whether the Notice was provided to the justices of the Alabama Supreme Court for their review.

Thus, Sibley argues that this court should not give any weight to the fact that the Alabama Supreme Court never ruled on the Notice. This court, however, will not dwell on this uncertainty because regardless of whatever the Alabama Supreme Court's inaction meant, it is clear that the July 12, 2001 Notice sought no relief from any court, that the August 3, 2002 Revised Notice, which could be interpreted as an opposition to the state's motion to set an execution date, was filed outside the AEDPA one-year period, and that Sibley has provided no basis for the court to conclude that these documents related to one another in any way.

Sibley next argues that this court should conclude that Sibley's Notice was "properly filed" because the Alabama Supreme Court has previously treated unorthodox post-conviction appeals in death cases submitted directly to that court as properly filed, and considered them on the merits. Sibley points to two cases which he argues support this position—*Ex parte Holladay*, No. 88–258 (Ala. June 20, 2001) and *Ex parte Brown*, No.01–9454 (Ala. June 28, 2002). The State, however, argues that the pleadings in these two cases were not petitions for relief, but were merely motions for stays of execution.

At the hearing held before this court on November 5, 2002, on Petitioner's Motion for Stay of Execution, the State provided an Order from the *Holladay* case which clearly indicates that the Court ruled upon a motion for stay of execution. The State, also, submitted an Order from a case styled *Ex parte Gary Leon Brown*, which does not appear to match the case cited by Sibley, but also indicates that the Court ruled upon a motion for stay of execution. Also submitted by the State at the hearing were the pleadings filed in the *Holladay* and *Brown* cases which were styled "Petition for Stay of Execution and Relief from

Unconstitutional Punishment." Even though Sibley argues that the petitioners in those cases were seeking relief other than simply stays of execution, the substance of those motions clearly indicates that the petitioners were seeking stays of execution. Moreover, the Court's orders clearly demonstrate that the Court treated these motions as requesting a stay of execution. Thus, the court concludes that Sibley has failed to substantiate his argument that the Alabama Supreme Court has previously treated unorthodox post-conviction appeals in death case as properly filed, and considered them on the merits. Therefore, this argument fails to provide a basis to conclude that Sibley's Notices were properly filed.

For the reasons stated above, the court concludes that Sibley's Notices were not "properly filed application[s] for State postconviction or other collateral review" sufficient to toll the AEDPA statute of limitations pursuant to 28 U.S.C. § 2244(d)(2).

### B. *Ring v. Arizona*

■ Pointing to 28 U.S.C. § 2244(d)(1)(C) Sibley argues that the statute of limitations for his first habeas petition did not begin to run until June 24, 2002, the date on which the *Ring v. Arizona* decision was issued by the United States Supreme Court. 28 U.S.C. § 2244(d)(1)(C) provides that the one year statute begins to run on

> the date on which the constitutional right asserted was legally recognized by the Supreme Court, *if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review.* (Emphasis added).

Sibley argues that *Ring* is a new decision of substantive criminal law and is therefore retroactive.

In *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (June 24, 2002). the Supreme Court specifically held that the rule of law stated in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, is applicable to capital defendants. That is—the "Sixth Amendment does not permit a defendant to be expose[d] to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Ring,* 122 S.Ct. at 2428. In the instant case Sibley argues that his death sentence was imposed in violation of *Ring* because the trial judge, instead of the jury, found the existence of two aggravating factors necessary for the imposition of a sentence of death.

Although Sibley contends that the rule of law in *Ring* invalidates Alabama's sentencing scheme, and his own conviction and sentence, that is not the immediate question before the court. Rather, to fall within 28 U.S.C. § 2244(d)(1)(C) such that the *Ring* decision would provide the date for commencing Sibley's one-year period, *Ring* must be applied retroactively. At the outset, the court recognizes that the United States Supreme Court did not specifically address the retroactivity question within the *Ring* opinion. Thus, the court must look to previously established law to determine whether *Ring* may be applied retroactively to this case.

■ Under *Teague v. Lane,* "[u]nless [a case] falls within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The two exceptions to the general rule of nonretroactivity for cases on collateral review are identified in *Teague* as follows: (1) the rule is applied retroactively if it places "certain kinds of primary,

private individual conduct beyond the power of the criminal law making authority to proscribe." *id.* at 311, 109 S.Ct. 1060 and (2) the rule is applied retroactively "if it requires the observance of 'those procedures that ... are "implicit in the concept of ordered liberty." ' ". *Id.* at 307, 109 S.Ct. 1060, citations omitted.

Most courts which have addressed the retroactivity question with respect to *Apprendi,* including the Eleventh Circuit, have concluded that *Apprendi* is not retroactive. Indeed, in *McCoy v. U.S.,* 266 F.3d 1245, 1258 (11th Cir.2001), the Eleventh Circuit concluded that *Apprendi* does not apply retroactively on collateral review because "the new rule announced by the Supreme Court in *Apprendi* does not fall within either exception to Teague*'s* nonretroactivity standard." In reaching this conclusion, the Eleventh Circuit was persuaded by the reasoning of other circuits which concluded that neither the first nor second *Teague* exception applied. Indeed, the court concluded that the first exception did not apply to the criminal procedure announced in *Apprendi* because *Apprendi* "did not decriminalize any class of conduct or prohibit a certain category of punishment for a class of defendants," and the second exception did not apply because *Apprendi* was "not sufficiently fundamental." *Id.* at 1256–1258, citing *Jones v. Smith,* 231 F.3d 1227, 1237 (9th Cir.2000); *United States v. Sanders,* 247 F.3d 139, 148 (4th Cir.2001); *United States v. Moss,* 252 F.3d 993, 997 (8th Cir.2001). This court is persuaded that given the *Ring* Court's direct application of *Apprendi* to the death penalty context, the thoroughness of the *McCoy* decision, and the other persuasive circuit authority, the *McCoy* rational would apply equally to the question of whether *Ring* fits into either of the

*Teague* exceptions, leading to the conclusion that *Ring* fits into neither *Teague* exception.

Sibley argues, however, that *Ring* is not governed by *Teague* because *Ring* states a new rule of substantive, rather than procedural, criminal law.[5] *See Bousley v. United States,* 523 U.S. 614, 620, 118 S.Ct. 1604, 1609, 140 L.Ed.2d 828 (1998)(*Teague* is inapplicable to new rules of substantive criminal law). This question with respect to *Apprendi* has been answered by the Eleventh Circuit. In *McCoy,* the court concluded that the *Apprendi* decision did not create a new rule of substantive law. The court stated:

> In *Apprendi,* the Supreme Court specifically noted that "[t]he substantive basis for New Jersey's enhancement ... is not at issue, the adequacy of New Jersey's procedure is." The application of *Apprendi* merely changes the method or procedure for determining drug quantity and his sentence, it does not make McCoy's conduct not criminal, thereby raising the spectre of actual innocence as the concurring opinion implies. Thus, as other circuits have, we conclude *Apprendi* announced a new rule of criminal procedure.

266 F.3d at 1257 at n. 16 (citations omitted).

Although the Eleventh Circuit has not yet addressed whether *Ring* is a substantive rule of law, the Tenth Circuit has concluded that

> *Ring* is simply an extension of *Apprendi* to the death penalty context, ... Accordingly, this court's recent conclusion in *United States v. Mora,* 293 F.3d 1213, 2002 WL 1317126 at *4 (10th Cir.2002) that *Apprendi* announced a rule of crim-

---

**5.** Sibley does make the cursory argument that as a new rule of substantive criminal law, *Ring* should qualify for the first *Teague* exception and should apply retroactively. Sibley, however, articulates no reasons to support this argument.

inal procedure forecloses Cannon's argument that *Ring* announced a substantive rule.

*Cannon v. Mullin,* 297 F.3d 989, 994 (10th Cir.2002). This court agrees. Prior judicial determinations that *Apprendi* is not a substantive rule argue in favor of the conclusion that *Ring* is not a substantive rule, either. Sibley has cited this court to no circuit or district case concluding otherwise. Accordingly, the court concludes that *Ring* may not be applied retroactively to Sibley's case which is on collateral review.[6] Thus, the court concludes that *Ring* does not fit within 28 U.S.C. § 2244(d)(1)(C), and therefore, Sibley's argument that the one-year statute of limitations began to run on June 24, 2002, the date the *Ring* decision was issued, fails.

### C. Actual Innocence

■ Sibley also contends that, even if his claims fall outside of the AEDPA statute of limitations, they cannot be time-barred as he is actually innocent of the crime for which he is convicted and that new evidence not presented at his trial supports his claim of actual innocence.

In *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Supreme Court determined that when a "petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims, the petitioner must demonstrate that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327, 115 S.Ct. 851. To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial. *Fortenberry*

*v. Haley,* 297 F.3d 1213, 1222 (11th Cir. 2002).

■ Sibley has argued that he is actually innocent of the crime for which he was convicted and sentenced because, although he fired a weapon at Sgt. Motley, he did not have the requisite intent to kill the police officer. Under Alabama law, a person must have particularized intent to kill to be found guilty of capital murder. *See Lewis v. State,* 456 So.2d 413, 417 (Ala. Crim.App.1984); *Beck v. State,* 396 So.2d 645, 662 (Ala.1980).

Sibley argues that because he acted in self-defense, he did not have the requisite particularized intent to kill. He states that he did not initiate the confrontation with Sgt. Motley and that the haste with which Sgt. Motley began to draw his weapon indicated that he intended to use the weapon and that Sibley and his young stepson, who was in the car with him at the time, were in danger. Sibley argues that new evidence not disclosed at trial about Sgt. Motley's history strengthens Sibley's claim of self-defense, because it makes it clear that Sgt. Motley had a history of aggressive behavior.

■ Under Alabama law, the issue of self-defense is presented to a jury as long as the slightest evidence most favorable to the defendant can be reasonably interpreted as placing the accused in apparent imminent danger to life or other grievous bodily harm. *See King v. State,* 478 So.2d 318, 319 (Ala.Crim.App.1985). An accused is not, however, entitled to have a claim of self-defense submitted to a jury "if the undisputed evidence shows clearly that the accused was not in actual or apparent imminent peril, that the accused was able to

---

**6.** The court notes that Sibley makes several arguments premised on the merits of *Ring* as to why he is due habeas relief. However, the court's conclusion that *Ring* is not retroac-

tively applicable to cases on collateral review makes consideration of these arguments unnecessary. Accordingly, the court will not address these arguments.

retreat, or that the accused was at fault." *Carter v. State*, 2001 WL 564269 at *2 (Ala. May 25, 2001)(quoting Charles W. Gamble, *McElroy's Alabama Evidence* § 457.02(5)(a) and (b)(5th ed.1996)).

Sibley's testimony at trial was that once he had drawn his weapon in response to Sgt. Motley having reached for his own weapon, Sgt. Motley ducked down and ran away from Sibley. Specifically, Sibley testified that

> The police officer turned abruptly clockwise nearly a hundred and eighty degrees and began running back to his car. However, he did not run in panic, he doubled over, I presume to protect his head and to present a smaller target and at this time, all the time, he had his hand obviously on the gun butt.

Record Volume XI at page 1339.

The evidence Sibley apparently relies on as "new evidence" of his actual innocence is testimony from his stepson and evidence of the personnel records of ·Sgt. Motley.

At trial, Sibley was denied the right to discover the personnel records of Sgt. Motley. Record, Volume XI at page 1235–1239. But, as the Respondent points out, the identities of persons with knowledge of complaints contained in that file were known to Sibley's attorney. In any event, the court agrees that this evidence was not presented at trial.

With regard to the stepson, Sibley was denied a continuance during the course of the trial to subpoena his stepson to come from Florida to testify. The trial court indicated that it would have allowed for the stepson to be brought to trial had the matter been raised earlier, rather than after the State had put on its entire case and rested. Record, Volume XII at pages 1390–1391. The attorneys for Sibley made a proffer that the stepson would testify that he had not called for help. This evidence also was not presented to the jury at trial.

The stepson's testimony, as far as this court is aware, does not bear on the question of whether Sibley reasonably feared for his or his stepson's safety, although it could be used to attack the credibility of the State's witness who testified that she called the police because of a child's call for help. Sibley, however, has presented no evidence to the court, by affidavit or otherwise, to show what the stepson would, in fact, have testified. .

The personnel file information on Sgt. Motley might substantiate Sibley's claim of self-defense to the extent that it could bolster Sibley's testimony that Sgt. Motley was the first aggressor, as evidence of prior complaints or conduct, if admitted, may have been viewed by the jury as evidence that Sgt. Motley would have reacted aggressively. Sibley's own testimony at trial, however, was as follows:

Q. Okay. What happened next?

A. He [Sgt. Motley] reached for his gun, which was -

Q. How do you know he was reaching for his gun?

A. Because I had seen—I saw it.

Q. You saw where his gun was?

A. Yes. And I saw him place, move his hand and place it on it.

Q. State of mind now?

A. Well -

Q. Has it changed from when you got out of the car?

A. Drastically. This is a red alert in my, in my thinking.

Q. All right. What does a red alert mean?

A. Well, this means that this is a definite danger. Since I was not informed of any infraction, since I quite honestly have never met a policeman in my life who's behaved in that manner and since he reached for his gun and since I know

of some other police shootings during my lifetime -

\* \* \* \* \* \*

Q. What happened next?

A. I reached for my gun as an instinctive reaction.

Q. Where was it?

A. It was in an inside the pants holster at the small of my back.

Q. What happened next?

A. Well, something that really surprised me. The police officer turned abruptly clockwise nearly a hundred and eighty degrees and began running back to his car. However, he did not run in panic, he doubled over, I presume to protect his head and to present a smaller target and at this time, all the time, he had his hand obviously on the gun butt.

Q. There has been testimony of different numbers of shots.

A. Oh, yeah.

Q. Where were your first shots fired?

A. I fired at that time because I knew that he could at any moment turn and fire. I've done a lot of handgunning practice.

Q. When did you hit Sgt. Motley and how did, how do you know that you did?

A. Well, I'll then retrace from that point. I, based on my presumption at that time that he may turn and fire at any moment and in any case he was going to use his car for cover and fire, I did, I did fire three rapid, shots in rapid succession at that time.

Q. Do you know if they hit him or not?

A. I don't believe they did because he made no reaction.

Q. Did you fire a fourth shot?

A. Yes, as he, I would say as he was very near the left—he was about in front, right in front of his car, I fired a fourth shot.

Q. Do you know where that hit him?

A. No. But he, at that time hollered, ouch.

Record, Volume XI at pages 1337–1341. In light of Sibley's testimony that he shot at Sgt. Motley as the officer was running away from him, this court must conclude that the standard that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence has not been met.

Sibley also argues that although he fired his weapon at, and hit, Sgt. Motley, it was actually his wife, Lynda Lyon, who killed him. Although Lynda Lyon testified at trial that when she shot at Motley he fell backwards, Sibley argues that new evidence from Lynda Lyon (who has now been executed) reveals that she saw one of her bullets strike Sgt. Motley in the chest. No evidence to that effect has been presented to the court, and the court is unaware of what form it might take.

■ The issue of which of the two persons who admittedly shot at Sgt. Motley, either Lynda Lyon or Sibley, actually fired the fatal shot is irrelevant as long as Sibley himself had the requisite intent to kill. *Harris v. State,* No. CR–00–0818, 2002 WL 31151417, —— So.2d —— (Ala.Crim.App. Sept.27, 2002) citing Section 13A–2–23(2) Ala.Code (1975). The jury had before it Lynda Lyon's testimony that Sgt. Motley fell backwards after she shot at him. Any further statements from Lynda Lyon would not negate that Sibley himself had the requisite intent to kill Sgt. Motley. Accordingly, the court concludes that Sibley fails to demonstrate that newly discovered evidence would prove that he is actually innocent of the crime for which he was convicted and sentenced. Thus, this argument fails to provide a basis for the court to conclude that the AEDPA statute of limitations should be equitably tolled.

## IV. CONCLUSION

Sibley failed to file a Petition for Writ of Habeas Corpus within one year after the expiration of the time within which he could have sought relief by certiorari in the Supreme Court of the United States. The Anti–Terrorism and Effective Death Penalty Act thus bars his Petition, unless his failure is excused.

Sibley failed to properly file a timely application for State postconviction or other collateral review, but emphatically notified the Supreme Court of Alabama that he rejected any jurisdiction of the courts over him and was seeking relief from Congress. The Supreme Court decision in *Ring v. Arizona* announces a procedural, rather than a substantive, rule of law and, therefore, is not retroactive to this case. And finally, Sibley has failed to make any credible showing that new evidence would establish his actual innocence of the crime for which he was convicted. Therefore, Sibley's late filing is not excused.

### ORDER

For the foregoing reasons the court concludes that the Respondent's Motion to Dismiss this case on the basis that the Petition is filed too late is due to be GRANTED.

Accordingly, it is hereby ORDERED as follows:

1. The Respondent's November 4, 2002 Motion to Dismiss Federal Proceedings for Failure to Comply with the Statute of Limitations is GRANTED.

2. The Stay of Execution imposed in the above-referenced case by Order of this court dated November 5, 2002 is DISSOLVED.

3. Final Judgment will be entered accordingly.

### FINAL JUDGMENT

The Respondent's Motion to Dismiss Federal Proceedings for Failure to Comply with the Statute of Limitations having been granted, it is CONSIDERED, ADJUDGED and DECREED that

The Petition for Writ of Habeas Corpus is DISMISSED with prejudice.